**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS MENGE, | ) | CASE NO. 1:15CV1321 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Thomas Menge ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

his applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB"),

under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) & 423 *et seq.* ("Act").  This

case is before the undersigned United States Magistrate Judge pursuant to the consent

of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set

forth below, the Commissioner's final decision is AFFIRMED.

## I.  PROCEDURAL HISTORY

In July 2007, Plaintiff filed his applications for POD and DIB, alleging a disability

onset date of August 1, 2000.  (Transcript ("Tr.") 562.)  The claims were denied initially

and upon reconsideration, and Plaintiff requested a hearing before an administrative law

judge ("ALJ").  (*Id.*)  On December 2, 2009, an ALJ held Plaintiff's hearing.  (Tr. 28-49.)

Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A

vocational expert ("VE") also participated and testified.  (*Id.*)  On January 25, 2010, the

ALJ found Plaintiff not disabled.  (Tr. 11-21.)  On December 22, 2010, the Appeals

Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1-3.)

Plaintiff then filed a civil action in the United States District Court for the Northern District of Ohio, challenging the denial of benefits.  *See Menge v. Comm'r of Soc. Sec.*, Case No. 1:11CV226 (N.D. Ohio.)  On July 25, 2012, Magistrate Judge Kenneth McHargh issued a Report & Recommendation that the January 2010 ALJ decision be reversed and the case remanded for further proceedings.[1]  (*Id.* at Doc. No. 19.)

In October 2012, the Appeals Council remanded the case to the hearing level for further proceedings.  (Tr. 652-654.)  The case was assigned to a different ALJ, who conducted a hearing on September 10, 2013.  (Tr.  585-615.)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A medical expert ("ME") and VE also participated and testified.  (*Id.*)  On November 25, 2013, the ALJ found Plaintiff not disabled.  (Tr. 562-577.)  On May 18, 2015, the Appeals Council declined to assume jurisdiction, and the ALJ's decision became the Commissioner's final decision. (Tr. 554-556.)

On July 2, 2015, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 14.)

Plaintiff asserts the following assignment of error:  The ALJ erred in finding that the Plaintiff's allegations of pain were not credible.

---

[1] Specifically, Magistrate Judge McHargh (to whom the parties had consented) reversed and remanded on the grounds that the ALJ's credibility finding was not supported by the record.  *Menge v. Comm'r of Soc. Sec.*, Case No. 1:11CV226 (N.D. Ohio) (Doc. No. 19.)

## II.    EVIDENCE

**A.    Personal and Vocational Evidence**

Plaintiff was born in June 1964 and was 41-years-old on his date last insured of December 31, 2005.  (Tr. 576.)  He had at least a high school education and was able to communicate in English.  (*Id.*)  He had past relevant work as an assistant store manager.  (Tr. 575)

**B.    Medical Evidence**

**1.    Medical Reports**

The medical evidence regarding Plaintiff's physical impairments is thoroughly and accurately set forth in Section II of the Memorandum Opinion & Order issued by Magistrate Judge McHargh on July 25, 2012 in *Menge v. Comm'r of Soc. Sec.*, Case No. 1:11cv00226 (N.D. Ohio) (Doc. No. 19.)  The Court will not repeat all of the medical evidence but, rather, incorporates that section of Magistrate Judge McHargh's opinion, which is attached as an appendix to this Opinion.

**2.    Agency Reports**

**a.    From Onset Date (August 2000)  to Date Last Insured ("DLI") (December 2005)**

In March 2002, Plaintiff underwent a consultative exam with Gordon Zellers, M.D., in connection with his workers compensation claim relating to an injury in May 1999.  (Tr. 254-257.)  During the exam, Plaintiff stated that, on May 26, 1999, while employed as an assistant store manager, he "experienced the acute onset of low back discomfort while unloading a quantity of carpet."  (Tr. 254.)  Dr.  Zellers noted a diagnosis of lumbosacral sprain and summarized objective findings regarding Plaintiff's

3

injury as follows:

> The patient's evaluation since May 26, 1999 has included the following:
> Routine lumbosacral spine x -rays performed on May 30, 1999 which were
> positive for evidence of scoliosis and intervertebral disc space narrowing
> at the lumbosacral spine level; an MRI of the lumbosacral spine performed
> on July 9, 1999 which was positive for evidence of both degenerative disc
> disease and central disc herniations at the T12-L1, L4-L5 and L5-S1 levels
> and a repeat MRI of the lumbosacral spine performed on May 8, 2001
> which was again positive for degenerative disc pathology at the T12-L1,
> L4-L5 and L5-S1 levels.  The interpreting radiologist indicated that the
> patient's May 8, 2001 MRI findings did not significantly differ from his
> previous MRI dated back to 1999.

(Tr. 254.)  Dr. Zellers further noted Plaintiff had attended eight weeks of physical

therapy; been prescribed a number of pain medications; and received two series of

epidural steroid injections.  (Tr. 255.)

Plaintiff complained of persistent daily low back pain radiating to the right calf and

left knee, and bilateral lower extremity numbness.  (*Id.*)  He estimated he "is currently

able to tolerate walking for 45 minutes at a time, standing for ten minutes at a time,

sitting for 20 minutes at a time and lifting no greater than 20 pounds maximum " (*Id.*)

On examination, Dr. Zellers found Plaintiff was in no acute distress but appeared

"somewhat uncomfortable."  (Tr. 256.)  He observed bilateral pain with palpation;

bilateral positive straight leg testing in the sitting position; and limited range of motion of

the lumbosacral spine.  (*Id.*)  Dr. Zellers found no muscle spasms, and bilateral lower

extremity motor, sensory, pulse, and tendon functions were normal.  (*Id.*)  Plaintiff was

ambulatory with a stable gait and able to heel and toe walk without difficulty.  (*Id.*)

Dr. Zellers concluded that "diagnostic studies have identified the presence of

significant disc pathology at the L4-L5 and L5-S1 levels" and "despite this patient's

compliance with conservative medical management, his recovery has been poor."  (*Id.*)

4

Dr. Zellers then opined that "[a]t this point in time the patient's lumbosacral spine pathology necessitates the following physical limitations: (1) Sedentary to modified light duty labor activities only; (2) Twenty pound maximum lifting limit on an occasional as tolerated basis only; (3) This patient should not be required to walk for greater than 45 minutes at a time, stand for greater than ten minutes at a time, or sit for greater than 20 minutes at a time; (4) This patient must be permitted to change body positions on a PRN [as needed] basis; (5) No significant bending responsibilities; (6) No repetitive labor activities involving the lower extremities; (7) No climbing activities; (8) No above ground work should that environment pose a threat to the patient's safety; (9) This patient should not be exposed to excessive vibratory stimuli; and (10) This patient should not be permitted to function in the work environment while under the influence of sedative-type medications should those medications pose a threat to his safety."  (Tr. 256-257.)

Thereafter, on September 30, 2002, state agency physician Robert E. Norris, M.D., reviewed Plaintiff's medical records and completed a physical residual functional capacity ("RFC") assessment.  (Tr. 258-266.)  Dr. Norris opined Plaintiff could lift and/or carry up to 20 pounds occasionally and 10 pounds frequently; stand/or walk for a total of up to 6 hours in an 8 hour workday; and sit for a total of about 6 hours in an 8 hour workday.  (Tr. 260.)  He also concluded Plaintiff retained an unlimited capacity to push and/or pull.  (*Id.*)  Dr. Norris further stated Plaintiff's medical record "does not show that [his] low back condition is sufficiently severe" to cause Plaintiff difficulty with walking, standing, and sitting.  (Tr. 264.)  On May 14, 2003, state agency physician Willa Caldwell, M.D., affirmed Dr. Norris' assessment as written.  (Tr. 266.)

5

### b.    Post-DLI

On August 30, 2006, Plaintiff presented to Dr. Zellers for a second consultative examination.  (Tr. 429-434.)  Dr. Zellers noted additional diagnostic studies, including a July 2002 MRI of Plaintiff's lumbosacral spine "which was positive for evidence of degenerative disc disease at the T11-T12, L4-L5 and L5-S1 levels with a right central disc protrusion at the T11-T12 level and bulging disc at the L3-L4 and L5-S1 levels." (Tr. 430.)  Dr. Zellers further observed that Plaintiff had "undergone a total of at least 12 surgical procedures as it relates to the insertion, replacement, and/or manipulation of his spinal cord stimulator and his infraspinal pain pump."[2]  (*Id.*)  He noted that "per the patient's history, his dorsa column stimulator and interthecal pain pump do result in a decrease in his regional pain complaints."  (Tr. 431.)

Plaintiff complained of persistent, daily low back pain radiating to his right foot and left knee accompanied by bilateral lower extremity numbness, weakness involving his right lower extremity, and an involuntary tremor primarily in his right lower extremity. (Tr. 432.)  He estimated he is "currently able to tolerate walking for five minutes at a time, standing for five minutes at a time, sitting for ten minutes at a time, and lifting 3 lbs. maximum."  (*Id.*)  On examination, Dr. Zellers found Plaintiff was in no acute distress but was "very uncomfortable."  (*Id.*)  He observed mild pain with palpation; borderline bilateral straight leg raising; and reduced range of motion of the lumbosacral

_____

[2]  Plaintiff underwent Phase I dorsal column stimulator and pain pump implantation procedures prior to his DLI.  Specifically, Plaintiff's dorsal column stimulator was inserted in February 2003, and his pain pump was implanted in March 2005.  (Tr. 322, 366-367, 460-462, 492-494.)  Plaintiff thereafter underwent a series of surgical procedures relating to these devices, both before and after his DLI.

6

spine.  (*Id.*)  Dr. Zellers further noted frequent, involuntary tremor of the right lower

extremity, and decreased sensation involving both feet. (*Id.*)  He found that "motor

testing demonstrated weakness with attempted right great toe dorsiflexion and right

plantar flexion."  (*Id.*)  Plaintiff was ambulatory with a "slow and slightly antalgic gait,"

and was unable to perform squatting maneuvers.  (*Id.*)

Dr. Zellers restricted Plaintiff to sedentary activities only with a three pound

maximum lifting limit on an occasional, as-tolerated basis only; no prolonged sitting,

standing, or ambulating; no repetitive activities with the lower extremities; and no

climbing, bending, twisting, or squatting.  (Tr. 434.)  He found Plaintiff "must be

permitted to change body positions on a prn basis" and, further, "must be permitted to

place himself in a supine position on a prn basis to assist with chronic pain control."

(*Id.*)  Finally, Dr. Zellers stated Plaintiff should not be exposed to vibratory stimuli or

permitted to perform above ground work or safety sensitive activities while under the

influence of sedative type medications.  (*Id.*)

In September 2007, state agency physician Jerry McCloud, M.D., reviewed

Plaintiff's medical records and completed a physical RFC assessment.  (Tr. 519-526.)

Dr. McCloud opined Plaintiff could lift and/or carry up to 20 pounds occasionally and 10

pounds frequently; stand/or walk for a total of up to 6 hours in an 8 hour workday; and

sit for a total of about 6 hours in an 8 hour workday.  (Tr. 520.)  He concluded Plaintiff

retained an unlimited capacity to push and/or pull.  (*Id.*)  Finally, Dr. McCloud found

Plaintiff could never climb ladders, ropes, and scaffolds, and could only occasionally

climb ramps and stairs, balance, stoop, kneel, and crouch.  (Tr. 521.)  On February 7,

2008, state agency physician Diane Manos, M.D., affirmed Dr. McCloud's assessment

as written.  (Tr. 530.)

**C.**     **Hearing Testimony**

      **1.**     **Plaintiff's Hearing Testimony**

            **a.**     **December 2, 2009 Hearing**

During the December 2, 2009 hearing, Plaintiff testified to the following:

- He graduated from high school, and has no difficulty reading or comprehending.  He is divorced and lives with his brother.  (Tr. 32-33.)

- He injured his back in May 1999.  He attempted to go back to work, but experienced severe back pain.  He has not worked since August 2000. (Tr. 35.)

- He has received a number of different treatments for his back pain, including narcotic pain medication, epidural blocks, a neurostimulator, and a pain pump.  (Tr. 36.)  Between 2000 and 2004, he was taking high doses of Oxycontin to relieve his pain.  (*Id.*)  He received some relief from pain medication, but not significant relief.  (*Id.*)

- In 2005, he underwent surgical implantation of a pain pump.  (Tr. 36.)  He also underwent surgery for a new neurostimulator. (*Id.*)  These devices improved his condition "somewhat," allowing him to stop taking Oxycontin. (*Id.*)  He continued, however, to take smaller doses of various pain medications.  (*Id.*)  Additionally, the pain pump causes lightheadedness and extreme nausea.  (Tr. 37.)

- In 2005, he could only take care of his "very basic needs."  (Tr. 36.)  He lived with his parents at that time and they "had to do everything for him." (*Id.*)  He was not able to make the bed, wash dishes, or make his own meals.  (Tr. 37.)  His parents "drove him everywhere."  (Tr. 36.)

- At the time of the hearing, he could drive short distances occasionally, i.e., under three miles once per month.  (Tr. 37.)  The only activity he could do around the house is the dishes, which takes him several hours.  (Tr. 47.) He confirmed that, on one occasion, he "overdid it" playing with his two year old granddaughter, but stated that, for him, "playing with her is just being with her."  (Tr. 46.)  He reads the newspaper and watches television.  (Tr. 47.)

- He has not had any improvement in his condition.  He continues to

experience severe pain when sitting or standing for short periods of time. He generally lays down 20 hours per day.  (Tr. 37.)  He is never pain free. (Tr. 37-38.)  His pain is usually a five on a scale of ten, "and that's on a good day."  (Tr. 38.)  Changing his position from standing to sitting helps to relieve his pain.  (Tr. 39-40.)

**b.    September 10, 2013 Hearing**

During the September 10, 2013 hearing, Plaintiff testified to the following:

- He has experienced severe back pain since 2000, along with pain in his hips and radiating pain down both his legs.  (Tr. 592, 596.)  He has had a number of back surgeries.  (Tr. 592-593.)  He has been treated with narcotic pain killers, a pain pump, and a neurostimulator.  (*Id.*)

- He is "in pain every single day" and spends the majority of his time "lying on the couch or in a recliner."  (Tr. 589-590.)  He seldom leaves the house and cannot take of himself.  (*Id.*)  On the day of the hearing, he rated his pain a five on a scale of ten, even after having "taken all my meds this morning before I came in."  (Tr. 591.)

- He lives with his brother, and his parents live two blocks away.  (Tr. 597.) His brother basically does all the household chores, with the exception of the dishes.  (Tr. 598.)  He can do the dishes, but it takes several hours. (Tr. 591.)  He does not cook other than making a sandwich or preparing a frozen meal.  (Tr. 592.)  He can only drive short distances.  (*Id.*)

- In September 2000, he told one of his doctors that he could sit for ten to sixty minutes; stand for ten to fifteen minutes; walk normally; bend or twist two or three times per hour; lift or carry up to 20 pounds; kneel or crawl for less than one minute; perform minimal ladder climbing activities; and use his hands and arms normally.[3]  (Tr. 593.)  When asked at the hearing if he could have done those things in 2000, he said no.  (*Id.*)

- In 2002, he estimated that he could walk for 45 minutes at a time; stand for 10 minutes at a time; sit for 20 minutes at a time; and lift no more than 20 pounds.[4]  (Tr. 594.)  When asked at the hearing if that was "correct back then," he said yes.  (*Id.*)

---

[3] Plaintiff estimated an ability to perform these activities during an examination with Jack Jones, M.D., on August 31, 2000.  (Tr. 246-249.)

[4] Plaintiff estimated an ability to perform these functions during his March 2002 consultative examination with Dr. Zellers.  (Tr. 254-257.)

9

- Although an x-ray from 1999 indicated that he had scoliosis, he did not know he had scoliosis and had never had surgery or braces for that condition.  (Tr. 596.)

- He went to Florida to visit family at some point in the last few years, but did not recall whether he drove or flew.  (Tr. 597.)  He thought he probably flew because he "couldn't handle a car ride like that."  (*Id.*)

- His symptoms and his ability to care for himself have been at the same level since his injury in 1999.  (Tr. 599.)

### 2. Medical Expert's Hearing Testimony

There was no ME testimony during the December 2, 2009 hearing.  During the September 2013 hearing, however, Malcolm Brahms, M.D., testified as an ME regarding Plaintiff's physical impairments and functional limitations.  (Tr. 599-605.)

Dr. Brahms discussed the medical evidence regarding Plaintiff's back and lower extremity pain, including the results of various physical examinations and MRIs during the relevant period (i.e., August 2000 through December 2005).  (Tr. 599-602.)  In particular, he noted several findings of positive straight leg raising but remarked that, aside from those findings, examinations revealed "no significant evidence of objective findings." (Tr. 601-602.)

Dr. Brahms concluded that, between August 2000 and December 2005, Plaintiff did not have a condition that met or equaled a listing.  (Tr. 602.)  He also found that, during that same time period, Plaintiff had the capacity to perform light work as follows.  (Tr. 602-603.)  Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, and stand and walk for six hours each in an eight hour day.  (Tr. 603.)  He required a sit/stand option.  (*Id.*)  Plaintiff was restricted from ladders, ropes, and scaffolds, and "should avoid lifting below waist level," which the ALJ clarified to mean

"no frequent stooping or bending." (*Id.*)  Further, in Dr. Brahms' opinion, "kneeling is perfectly okay" but "crawling would not be advised." (*Id.*)  Finally, Dr. Brahms found that Plaintiff should "not use his feet to manipulate controls."  (Tr. 604.)

On cross examination, Dr. Brahms explained that the above limitations applied only to the August 2000 to December 2005 time period and that he would have a different opinion regarding Plaintiff's limitations thereafter.  (Tr. 604.)  The basis for his change in opinion was that Plaintiff "was finding it necessary to use a pump with continuing control of that pump frequently." (*Id.*)

### 3.    Vocational Expert's Hearing Testimony

During the December 2, 2009, the VE testified Plaintiff had past relevant work as an assistant store manager, which is defined as light work by the Dictionary of Occupational Titles ("DOT") but was performed by Plaintiff at the "very heavy" level.  (Tr. 40.)  The ALJ then posed the following hypothetical:

> I want you to consider an individual of [Plaintiff's] age, which is [45] . .  and a high school graduate . . .who would have a full sedentary range of ability. . . I want you also to consider a sit/stand – sedentary sit/stand.  As far as additional non-exertional limitations, the gentleman should not be exposed to moving machinery or hazards.  He should not be exposed to any unprotected heights to include ladders, scaffolds, ropes.  In regards to postural and manipulation limitations, there should be no frequent stooping or bending.  I make no reference to any manipulation problems.  I make no reference to any mental limitations.

(Tr. 41.)  The VE testified the hypothetical individual could perform such representative jobs as information clerk (sedentary, semi-skilled, SVP 4); personnel scheduler (sedentary, semi-skilled, SVP 4); and inspector of printed circuit boards, assembly (sedentary, unskilled, SVP 2).  (Tr. 41-42.)

Plaintiff's attorney then modified the ALJ's hypothetical as follows:

11

Q:     Mr. Anderson, if you would take the judge's hypothetical question with the following amendment, that this individual can lift three pounds maximum on an occasional basis; can perform no, no bending, twisting, squatting; and cannot be permitted to perform any safety sensitive activities or activities requiring attention to detail due to the sedative effects of medication.   With those amendments, could the individual perform any of the jobs?

* * *

A:     Well, there's no lifting with the information clerk other than maybe a pencil.  Same thing with the scheduler.  The circuit board assemblies are under five pounds. I don't know if they're three pounds.  They're not considered hazard – I don't – in terms of no safety considerations, there's no hazards that are identified as environmental conditions.  I don't know how to look at it any different than that.

(Tr. 43.)  The VE also testified, in response to further questioning from Plaintiff's attorney, that there would be no jobs for an individual who needs to lay down for one to two hours during the work day.  (Tr. 44.)

During the September 10, 2013 hearing, the VE testified Plaintiff's past relevant work could be classified as either manager/retail store (DOT 185.167.046) (light, skilled, SVP 7) or sales person, general hardware (DOT 279.357.050) (light, semi-skilled, SVP 4).  (Tr. 606.)  The VE stated that, although the DOT classifies these positions as light work, Plaintiff performed them at the heavy level of exertion.  (Tr. 606-607.)

The ALJ then posed the following hypothetical question:

Now, I'm going to give you the capabilities and limitations of a hypothetical person. * * * This person is male.  As of December of 2005, 41 years of age, the same educational background, and work background as Mr. Menge.  This hypothetical person can lift, carry, 20 pounds occasionally, 10 pounds frequently.  This person can walk, stand, and sit each six out of eight hours a day, but would need a sit stand option.  Hang on.  I'm going to clarify that for you.  This person could stand and walk 45 minutes at a time, sit 20 minutes at a time, would have to be able to make frequent position changes.  This person can frequently push, pull, but never foot

12

pedal.  The lift, carry would be at or above waist level.  Okay?  Now this person can occasionally use a ramp or stairs, but never a ladder, rope or a scaffold.  Can constantly balance, occasionally stoop, kneel, and crouch, but never crawl.  Manipulative capabilities are all constant, as are visual capabilities and communication skills.  This person should avoid dangerous machinery and unprotected heights.  And that's it.

(Tr. 607-608.) The VE testified such an individual could not perform Plaintiff's past work, either as it is generally performed or as Plaintiff actually performed it.  (Tr. 608.)  The hypothetical individual could, however, perform such representative jobs as gate guard (light, semi-skilled, SVP 3); mail clerk (light, unskilled, SVP 2); and cashier (light, unskilled, SVP 2).  (Tr. 608-609.)

The ALJ then posed a second hypothetical that was the same as the first except it changed the lift/carry restriction to up to 10 pounds occasionally and frequently; and provided that the hypothetical individual could stand and walk two out of eight hours per day for 55 minutes at a time before changing position, and sit for six out of eight hours per day for 20 minutes at a time before changing position.  (Tr. 609-610.)  The VE testified these restrictions would eliminate the mail clerk position, but the hypothetical individual could perform the previously identified gate guard and cashier positions, as well as the job of telephone solicitor (sedentary, semi-skilled, SVP 3).  (Tr. 610-611.)

Plaintiff's attorney then asked the VE regarding employer tolerance of off-task behavior and absenteeism.  (Tr. 612-613.)  With regard to off-task behavior, the VE testified that "there's more and more research about performance at work and I believe there is an expectation of about 80 percent expectation, upon what we call on task." (Tr. 612.)  With regard to absenteeism, the VE stated employers would accept "no more than one day a month and that would be at the high end of what would be accepted."

13

(Tr.  613.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth

14

and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    Mr. Menge last met the insured status requirements of the Social Security Act on December 31, 2005.

2.    Mr. Menge did not engage in substantial gainful activity during the period from his alleged onset date of August 1, 2000 through his date last insured of December 31, 2005 (20 CFR 404.1571 et seq.).

3.    Through the date last insured, Mr. Menge had the following severe impairments: disorders of back discogenic and degenerative and fracture of bones (20 CFR 404.1520(cc)).

4.    Through the date last insured, Mr. Menge did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured, Mr. Menge had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), with the ability to lift/carry at or above waist level, 20 pounds occasionally, 10 pounds frequently; walk, stand, and sit, each 6 out of 8 hours a day, but would have needed a sit/stand option, with the ability to stand/walk 45 minutes at a time, sit 20 minutes at a time, with the ability to make frequent position changes; with the ability to frequently push/pull; precluded from using foot pedal; with the ability to occasionally use ramp or stairs; precluded from using ladder, rope, and scaffold; with the ability to constantly balance; with the ability to occasionally stoop, kneel and crouch; precluded from crawling; and precluded from work involving dangerous machinery and unprotected heights.

6.    Through the date last insured, Mr. Menge was unable to perform any past relevant work (20 CFR 404.1565).

7.    Mr. Menge was born on June 3, 1964 and was 41 years old, which is defined as a younger individual age 18-49, on the date last insured. (20 CFR 404.1563).

8.    Mr. Menge has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability as using the Medical-Vocational Rules as a framework supports a finding that Mr. Menge is "not disabled," whether or not he has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Through the date last insured, considering his age, education, and work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Mr. Menge could have performed (20 CFR 404.1569 and 404.1569(a)).

11.   Mr. Menge was not under a disability, as defined in the Social Security Act, at any time from August 1, 2000, the alleged onset date, through December 31, 2005, the date last insured.  (20 CFR 404.1520(g)).

(Tr. 562-577.)


# V.    LAW & ANALYSIS

## A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the

16

evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.      Plaintiff's Assignment of Error**

**1.      Credibility**

In his sole assignment of error, Plaintiff argues the ALJ failed to articulate sufficient reasons for discounting his credibility and, further, that the reasons provided are not supported by substantial evidence.  (Doc. No. 12 at 15.)  Plaintiff first complains the ALJ improperly relied on evidence arising after his DLI to support the finding that Plaintiff's allegations for period August 1, 2000 through December 31, 2005 are not credible.  (*Id.* at 17.)  Plaintiff also argues the ALJ incorrectly concluded that the medical evidence and objective findings fail to support Plaintiff's allegations of disabling pain.  (*Id.*)  Finally, citing extensively to the record, Plaintiff asserts the medical evidence and his extensive treatment history (including epidural blocks, narcotic pain medication, a doral column stimulator, and a pain pump) demonstrate the "consistency and credibility

17

of the pain." (*Id.* at 18.)

The Commissioner argues the ALJ properly considered the record as a whole to find that Plaintiff's allegations of disabling pain were not supported by the record evidence.  (Doc. No. 14 at 7.)  She asserts "the ALJ did not solely rely on evidence which post-dated the DLI but cited to numerous factors in assessing Plaintiff's credibility, including Plaintiff's allegations and testimony (Tr. 567-569); medical records, medical findings and treatment history (Tr. 569-571); activities (Tr. 568-569); and opinion evidence (Tr. Tr. 571-574)." (*Id.* at 8.)  In particular, the Commissioner notes the ALJ considered the opinions of ME Dr. Brahms and state agency record reviewing physicians Drs. Norris and Caldwell, each of which supported the ALJ's conclusion that Plaintiff's allegations of disability were less than fully credible.  (*Id.* at 10-11.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs., 667 F.2d 524, 538 (6th Cir. 1981), cert. denied, 461 U.S. 957 (1983).*  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment.  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms."  SSR 96-7p.  Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the

18

alleged disabling pain.  *See Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. *Id.*  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight." SSR 96-7p, Purpose section; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* SSR 96–7p, Purpose.  Beyond medical evidence, there are seven factors that the ALJ should consider.[5]  The ALJ need not analyze all seven

---

[5]  The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and

factors, but should show that he considered the relevant evidence.  *See Taynor v. Colvin,* 2014 WL 2580085 at * 18 (N.D. Ohio June 9, 2014) (White, M.J.);  *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, a review of the decision reveals the ALJ properly evaluated Plaintiff's credibility.  (Tr. 567-575.)  The ALJ thoroughly examined Plaintiff's hearing testimony and written statements regarding his symptoms, treatment, and daily activities.  (Tr. 567-569.)  In addition, the decision recounted, at length, the medical evidence regarding Plaintiff's back pain, including the MRIs of Plaintiff's lumbosacral spine in 1999, 2001 and 2002; his treatment history and responses to treatment; clinical examination findings; and physicians' opinions regarding Plaintiff's physical functional capabilities. (Tr. 569-574.)  In discussing this evidence, the ALJ considered the entire case record, including medical evidence post-dating Plaintiff's December 31, 2005 DLI.  The ALJ explained his reason for doing so, expressly noting that "Mr. Menge testified that the way he described his ability to function (at his 2013 hearing) has been at that level since his injury (The injury was in 1999)."  (Tr. 566, 569.)

The ALJ then stated that, "[a]fter careful consideration of the evidence, I find that Mr. Menge's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, his statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. 569.)  The ALJ explained his credibility determination as follows:

---

restrictions due to pain or other symptoms.  *See* SSR 96–7p, Introduction.

The record supports a finding that Mr. Menge's impairment is relatively stable with the use of his treatment modalities including the pain pump, neurostimulator, and pain medication.

Mr. Menge complained of pain since 1999.  [Exhibit 36F:5].  Subsequently, his treatment included multiple blocks, physical therapy, TENS unit, medications [Exhibit 35F:4], pain pump (2005) and neurostimulator (2009) [Exhibits 31F and 36F].  Mr. Menge's medications obtained from Walgreens Pharmacy are listed at Exhibit 33F.  In September 2009, his medications were listed as Soma, Phenergan, hydrocodone on a p.r.n. basis, which is intermittent and not daily [Exhibit 35F:4].  He had pain pump replacement and refills of the pain pump. [Exhibit 38F].

In 2003, he stated that he spent the majority of his day in bed or a chair in a "laying position" [Exhibit 5E].  In August 2006, Mr. Menge stated that he was able to tolerate walking for 5 minutes at a time, standing for 5 minutes at a time, sitting for 10 minutes at a time, and lifting 3 pounds maximum (subsequent to the date last insured, Exhibit 23F/4).  He only saw his physician once every 2 months in August 2006, subsequent to the date last insured [Exhibit 23F].  On August 16, 2007, Mr. Menge stated that he had trouble with his left leg giving out and indicated that his leg was getting weaker (subsequent to the date last insured, Exhibit 11E).  This suggests that Mr. Menge has not alleged any improvement in his condition, even subsequent to his date last insured.  In August 2006, despite alleging extreme limitations including an ability to only sit 10 minutes at a time, Mr. Menge was found to not be in acute distress [Exhibit 23F:4].  In July 2011, he was described as very pleasant [Exhibit 36F:3].  Evidence after the date last insured does not specifically identify Mr. Menge's functional capacity through 2005.  However, Mr. Menge has not alleged improvement in his condition after his date last insured.  The evidence suggests that Mr. Menge has exaggerated his complaints and supports a finding that his allegations of pain and limitations are not credible with respect to the period of time that Mr. Menge was insured from August 1, 2000 through his date last insured of December 31, 2005.  Despite use of a pain pump (2005) and neurostimulator (2009), Mr. Menge continues to complain of significant pain.  The medical evidence of record, the minimal objective findings, the fact that Mr. Menge has been described as very pleasant despite alleging extreme limitations, travel by plane out of state despite alleging extreme limitations, notations that he was not in distress, and a description of a good appetite do not support Mr. Menge's allegations of pain and extreme limitations which would have precluded him the performance of substantial gainful work activity through December 31, 2005.

(Tr. 574-575.)  Additionally, earlier in the decision, the ALJ noted that, although Plaintiff

"has alleged pain since 1999 with extremely limited ability to function over many years,"

his muscle strength has been described as strong and "the record does not document

wasting from lack of use."  (Tr. 571.)

As an initial matter, the Court rejects Plaintiff's argument that the ALJ improperly

relied on evidence post-dating Plaintiff's DLI in assessing his credibility.  Plaintiff

expressly testified during the September 2013 hearing that his symptoms and ability to

care for himself have been at the same level since his May 1999 injury.  (Tr. 599.)  The

ALJ  noted this testimony several times in the decision and correctly stated that "Mr.

Menge has not alleged any improvement in his condition, even subsequent to his date

last insured."  (Tr. 575.)  Plaintiff cites no legal authority that, under these

circumstances,  it is error for an ALJ to rely on post-DLI evidence in assessing a

claimant's credibility.

Moreover, as the Commissioner correctly notes, the ALJ's credibility analysis did

not rely solely on post-DLI evidence.  Rather, the ALJ also considered medical evidence

dating from the relevant time period (i.e, August 2000 through December 2005),

including the MRIs of Plaintiff's lumbosacral spine and clinical examination findings.

The ALJ's conclusion that this evidence does not support Plaintiff's allegations of

disabling severity, is supported by substantial evidence in the record. While Plaintiff's

MRIs showed herniation in 1999 and disc degeneration in 2001 and 2002, there was no

evidence of major cord or nerve root compression, and/or central or neural foraminal

stenosis.  (Tr.  234, 252, 306.)  Morever, in February 2001, Bhupinder Sawnhy, M.D.,

reviewed Plaintiff's 1999 MRI and stated that "no significant disc herniation is noted."

(Tr. 341-342.)

22

In addition, the ALJ correctly noted that clinical examinations during the relevant time period found Plaintiff was in no acute distress; had normal muscle tone and strength; and was fully ambulatory.  (Tr. 342, 339, 256.)  Indeed, after the implantation of a dorsal column stimulator in 2003, Plaintiff often reported feeling "quite well" and getting "good coverage from the stimulator."  (Tr.  422, 425, 421, 413, 401.)  In July 2004, Plaintiff stated the stimulator was doing a "very good job" and helping with the radiculopathy, so much so that he was able to walk for "long periods of time," perform activities of daily living, and "do some work around the house."  (Tr. 421.)  In April and July 2005, Plaintiff continued to report doing "very, very well" and "quite well," respectively.  (Tr.  401, 413.)  It was not unreasonable for the ALJ to conclude that these clinical findings undermined Plaintiff's allegations of extreme functional limitations, including his testimony that he needed to lay down for the "majority of the day" because of his pain. [6]

Finally, the ALJ also considered the opinions of ME Dr. Brahms and state agency record reviewing physicians Drs. Norris and Caldwell, each of whom limited their opinions to the relevant time period and found Plaintiff was capable of a reduced range of light work despite his allegations of disabling pain.  (Tr. 574.)  Notably, Plaintiff does

---

[6]  Post-DLI clinical examinations also describe Plaintiff as being in no acute distress, ambulating well, and having good muscle strength.  (Tr. 510, 534, 723-725, 730-731, 779.)  Moreover, Plaintiff also often reported activity inconsistent with his allegations of disabling pain.  For example, in March 2009, Plaintiff stated he had recently visited Disney World where he "mostly just walked."  (Tr. 536.)  In July 2011, Plaintiff reported "no pain."  (Tr. 788.)  In August 2011, Dr. Sawhny noted Plaintiff "is doing well with good control over the pain.  Fully ambulatory, back to normal activities."  (Tr. 789.)  Several years later, in March 2013, Plaintiff again reported "doing well" and "staying active."  (Tr. 796.)

not challenge the ALJ's assessment of the opinion evidence in this case.

While Plaintiff urges the Court to find that the reasons given by the ALJ do not demonstrate a lack of credibility, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).  *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")  The ALJ provided sufficiently specific reasons for his credibility determination and supported those reasons with reference to specific evidence in the record.  Plaintiff's sole assignment of error is without merit.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.


                                        *s/ Nancy A. Vecchiarelli*
                                        U.S. Magistrate Judge

Date: April 18, 2016

24